**Abraisto Vincent ROMERO, Plaintiff-Appellant,**

v.

**UNION PACIFIC RAILROAD, a corporation, United Transportation Union and Association, H. H. Brandt, R. B. Murdock, D. D. Sorenson, and A. L. Young, Defendants-Appellees.**

No. 78–2006.

United States Court of Appeals, Tenth Circuit.

Submitted Nov. 28, 1979.

Decided Feb. 22, 1980.

Edgar Young of Patrick E. Hacker & Associates, Cheyenne, Wyo., for plaintiff-appellant.

Henry F. Bailey, Jr. of Loomis, Lazear, Wilson & Pickett, Cheyenne, Wyo. (Frederick G. Loomis, Cheyenne, Wyo., with him on the brief), for defendants-appellees Union Pac. RR. Co., H. H. Brandt, D. D. Sorenson and A. L. Young.

Edwin H. Whitehead of Urbigkit, Mackey & Whitehead, Cheyenne, Wyo. (Walter C. Urbigkit, Jr., Cheyenne, Wyo., with him on the brief), for defendants-appellees United Transp. Union and Ass'n and R. B. Murdock.

Before HOLLOWAY, McWILLIAMS and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Plaintiff Abraisto Vincent Romero, a citizen of the United States whose national origin is Mexican-American, brought this action against the Union Pacific Railroad, and three Railroad employees, H. H. Brandt, D. D. Sorenson, and A. L. Young, as well as the United Transportation Union and R. B. Murdock, Union general chairman. The amended complaint alleges that the Railroad and its named employees violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by delaying Romero's reinstatement because of his national origin and in retaliation for his filing a discrimination complaint with the Wyoming Fair Employment Commission and the Equal Employment Opportunity Commission. Romero further alleges that the Union and its general chairman violated Title VII by consenting to and conspiring with the Railroad in the discrimination and retaliation, thereby also violating Title VII. In

addition, the suit charges a conspiracy in violation of 42 U.S.C. § 1985(3), and a common law count of infliction of serious mental distress based upon pendent jurisdiction. Romero seeks back pay for loss of income, compensatory damages for alleged embarrassment, humiliation and mental suffering, and punitive damages.

The defendants filed certain motions to dismiss, contending among other things that the court lacked subject matter jurisdiction over the individual defendants under Title VII, that Romero failed to exhaust administrative remedies provided him under the National Railway Labor Act, 45 U.S.C. § 151 *et seq.*, and that Romero failed to state a claim under 42 U.S.C. § 1985(3). In addition, all defendants filed motions for summary judgment on the Title VII claims.

The trial judge treated the various motions filed in the action as a single one for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. He then granted the motion for summary judgment on the Title VII claims without addressing the other issues. On appeal, Romero urges that there are controverted material issues of fact precluding summary judgment. We agree.

## I.

*The Title VII Summary Judgment Issue*

On April 9, 1976, approximately five months after entering service as a Switchman-Brakeman for the Union Pacific Railroad, Romero was involved in an incident at the Union Pacific clubhouse in Rawlins, Wyoming, with a maid employed by the Railroad. The maid claimed Romero was intoxicated and attacked her. As a result of the incident, Romero was arrested by the Rawlins police department and suspended by the Railroad pending the outcome of a Railroad investigation into possible rule violations.

On April 21, 1976, a formal fact finding proceeding was conducted by representatives of the Railroad. Romero was present and represented by Dick Tritt, local chairman of the Union, and K. P. Murphy, former local chairman of the Union. Romero denied that he attacked the maid, contending that he just covered her mouth because she was hysterical. Rec., vol. I, at 217. He admitted, however, that he had consumed four or five beers during the course of the evening. The hearing officer found that Romero was acting under the influence of alcoholic beverages and conducting himself in a manner that manifested a disregard for the safety of others, thereby subjecting the Railroad to criticism and loss of goodwill, all in violation of General Rules B and G and Operating Rules 700 and 701. As a result, Romero was dismissed from service on April 26, 1976.

Following his discharge, Romero voluntarily enrolled in the Employee Assistance Program of Union Pacific Railroad, a program designed to assist current and former employees in overcoming drug or alcohol related personal problems and to promote eventual reinstatement of rehabilitated individuals. The Railroad agrees that between April, 1976 and August, 1976, Romero worked with the Employee Assistance Program and received favorable reports. Rec., vol. I, at 175, 180. Then in August of 1976, the charges that had been filed in the justice court in Rawlins, Wyoming in connection with the alleged assault were dismissed with prejudice after Romero paid the complainant $500 for the damage to her hearing aid and glasses. Rec., vol. IV, at 38. Thereafter, Romero requested but was denied reinstatement by the Railroad.

In October, 1976, Romero filed complaints with the Wyoming Fair Employment Commission and the Equal Employment Opportunity Commission charging the Railroad[1] with national origin discrimination in its discharge and subsequent refusal to rehire

---

1. Section 703(a)(1) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), provides:

    It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual,

or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin . . . . . .

him. Rec., vol. I, at 91. In April, 1977, he also filed complaints against the Union,[2] alleging national origin discrimination in its follow-up of the discharge, and retaliation[3] for his filing complaints against the Railroad. Rec., vol. I, at 92, 357.

Romero continued to request reinstatement by the Railroad until he was finally returned to service, with full seniority and other employment benefits, in July, 1977, approximately fifteen months after his discharge.

Romero contends that his reinstatement was unlawfully delayed because of his national origin and his filing of the discrimination complaints with the Wyoming Commission and the EEOC. In this connection, the investigator for the Wyoming Commission, David Garcia, found reasonable cause to believe the delay in Romero's reinstatement was the result of discrimination and retaliation, although he concluded Romero had not been discriminated against in the original discharge. Rec., vol. I, at 267–268. After conciliation efforts failed, Romero obtained his right to sue letters from the EEOC on December 7, 1977, and thereafter filed this suit on March 6, 1978.

Following the submission of briefs and oral arguments on defendants' motions, the trial court granted summary judgment. In so doing, the judge explained his reasoning in an accompanying Memorandum Opinion:

It is asserted that the plaintiff has not carried his burden. *The plaintiff has not shown that a prima facie case of retaliation exists.* From the facts, it is clear that the disciplinary action was not a result of plaintiff's Complaint. The reason for discharge was that Company rules were violated. Plaintiff attacked a woman on Company property while under the influence of alcohol. There was a potential of great risk to other individuals and property if the plaintiff was retained in service. *The reason plaintiff was not rehired when he felt he should have been was because he did not fully cooperate in the Employee Assistance Program* and the severity of the rules violations required complete rehabilitation and assurances that further activities of this sort would not result. *Clearly, the disciplinary action would have occurred irregardless of plaintiff's pursuit of statutory remedies.*

The facts also show that the length of time the plaintiff was discharged was not disproportionately greater than other employees discharged under similar circumstances. Further, the facts do not indicate the causal connection between protected activity and acts of alleged retaliation.

Rec., vol. I, at 377–378 (emphasis added). Certainly there can be no question that plaintiff's conduct presented a situation where the Company had to decide whether he was fit for service and instead presented a very high risk of danger to himself and to other individuals working for the Company. This was a valid business judgment based upon a valid business policy and was in no way related to

---

2. Section 703(c) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, provides:

It shall be an unlawful employment practice for a labor organization—
(1) . . . to discriminate against, any individual because of his . . . national origin;
(2) to . . . fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's . . . national origin; or

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

3. Section 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a), provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, . . . or for a labor organization to discriminate against any member thereof . . . because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this title.

plaintiff's national origin or any filing of complaints or charges.

Rec., vol. I, at 379. Based on these conclusions, the judge found no genuine issue as to any material fact and held the defendants entitled to summary judgment as a matter of law.

## A.

### Issues of fact pertaining to the Railroad's liability

As we have previously noted, Romero's complaint against the Railroad is two-pronged: that the company delayed his rehiring because of his national origin and in retaliation for pursuing his statutory right to file a discrimination complaint with the EEOC. The trial court correctly held that the employment discrimination analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies both to the charge of discrimination and to the charge of retaliation. We note too that a plaintiff need not be successful on an original charge of discrimination in order to have a valid claim of retaliation. *Rutherford v. American Bank of Commerce*, 565 F.2d 1162 (10th Cir. 1977).

*McDonnell Douglas* sets out the following three-step analysis for determining employment discrimination: the plaintiff must first establish a prima facie case of discrimination; the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision in question; thereafter, the plaintiff must be afforded an opportunity to show that the employer's stated reason for making the employment decision was in fact a pretext for unlawful discrimination. *McDonnell Douglas, supra*, 411 U.S. at 802–805, 93 S.Ct. at 1824–1825. A plaintiff makes out a prima facie claim by showing:

(i) That he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* at 802, 93 S.Ct. at 1824.

The trial judge here specifically found that Romero failed to establish a prima facie case of retaliation or national origin discrimination. Instead he held that Romero was not qualified for reinstatement because he had not fully cooperated in the Employee Assistance Program and was not completely rehabilitated. But the evidence in the record on both the issues of cooperation and rehabilitation was disputed.

In support of its contention that Romero did not cooperate with the Employee Assistance Program and was not rehabilitated, the Railroad submitted several affidavits of company employees. One of the affiants, defendant Sorenson, was director of the Railroad's Employee Assistance Program and the direct supervisor of Ed Engstrom, Romero's counselor. Although Sorenson had no direct contact with Romero other than one meeting in the office of the investigator for the Wyoming Fair Employment Commission, Rec., vol. IV, at 86, 90–91, he stated in his affidavit that Romero refused to cooperate with the Employee Assistance Program commencing in August, 1976, citing as examples the fact that Romero would not participate in one-on-one therapy with qualified professionals and that Romero began drinking again in November, 1976. Rec., vol. I, at 176–177. Mr. Engstrom testified in his affidavit that Romero's attitude changed significantly after August of 1976, when the civil and criminal charges against him were dismissed. He stated that "suggestions that he pursue psychological testing and one-on-one counseling were rejected by Mr. Romero," and although Romero attended AA meetings on an occasional basis from August through February of 1976–1977, he "refused to fully cooperate with Employee Assistance." Rec., vol. I, at 180.

In a letter to defendant A. L. Young, the Railroad's equal employment officer, defendant D. D. Sorenson, stated on February 1, 1977:

Our counselor has advised Mr. Romero that he should follow through with some form of rehabilitation program that would furnish visible evidence of his desire to alleviate management's concern that his past behavior will not recur. The counselor suggested Alcoholics Anonymous, which Mr. Romero tried for awhile and quit, and then more recently, suggested some one-on-one therapy with a therapist at Mental Health to which he refused.

Rec., vol. I, at 317.

However, there is evidence directly disputing the above suggestions that Romero was not cooperating with the Employee Assistance Program and was not rehabilitated. Thus, Romero testified in his deposition that he quit drinking when he got fired, and with the exception of a couple of beers on one occasion, he has remained a nondrinker. Rec., vol. IV, at 55–56. He testified further that he stopped going to Alcoholics Anonymous meetings at the suggestion of Mr. Engstrom, his Employee Assistance Program counselor, in order to have time to help train children in boxing. Rec., vol. IV, at 55, 60, 64, 67–68.

More importantly, Engstrom counseled with Romero on a periodic basis and filed reports about his progress. In his first progress report on August 26, 1976, Engstrom stated: "He can do a good job and has the support of his family and is basically a very responsible man." Rec., vol. I, at 290. In an evaluation report dated October 29, 1976, Engstrom concluded:

Client's attitude—Better, I feel this client sees his case as getting some attention and this seems to satisfy him for the time being.

Family Support—Excellent . . ..

Ability to work—*Excellent. In my opinion he is physically and emotionally equipped to handle his job.*

Rec., vol. I, at 298 (emphasis added). Thus, as early as October, 1976, Romero's counselor in the Employee Assistance Program felt he was sufficiently rehabilitated to return to work.

With respect to the need for one-on-one therapy, Engstrom wrote in a memo to file dated December 17, 1976:

*On our initial contact w/Romero and his family I didn't see the need for mental health resources and still don't.* This client is basically a responsible, family oriented man and an excellent worker. In my conversations w/employees who work w/him they view him as a punctual, accurate, hard worker . . . .. He remains harmless to himself, his family, and employees as long as he doesn't drink.

Rec., vol. I, at 300–301 (emphasis added). Engstrom's conclusion here about the lack of need for one-on-one therapy directly contradicts defendant Sorenson's assertion as early as November, 1976 that Romero needed one-on-one therapy, Rec., vol. I, at 176, and consequently casts some doubt on Sorenson's conclusion that Romero's refusal to accept such therapy evidenced his lack of cooperation with the program.

Significantly, on December 31, 1976, Engstrom submitted a favorable evaluation in response to a progress request:

Client's attitude—Good—He has difficulty in accepting the reinstatement process and feels that his involvement with EAP has hindered his reinstatement.

Family Support—Excellent, his wife and children have been constant support.

Ability to work—Excellent.

Prognosis—This client, as a result of observing what has been done in his behalf and the personal efforts he has made to control his impulses has an excellent chance to function effectively. He has the ability to stay sober and live a productive, safe life.

Rec., vol. I, at 272. However, on January 4, 1977, defendant Sorenson requested a reevaluation. Rec., vol. I, at 273. The second Engstrom report on January 14, 1977 was considerably less favorable. Rec., vol. I, at 274–275. In a memo from Sorenson to Engstrom on January 18, 1977, the second report was described as a "good report." Rec., vol. I, at 276.

In opposition to defendants' motions for summary judgment, Romero submitted an

affidavit from David R. Garcia, the Wyoming Fair Employment Commission investigator, who attached his investigative report to the affidavit. The investigative report included all of the Sorenson and Engstrom memoranda referred to above. In addition, Garcia stated in his report that Engstrom told him on November 24, 1976 he did not believe Romero to be an alcoholic, and that requiring Romero to seek professional one-on-one therapy would do more harm than good. Rec., vol. I, at 260.

■ In reviewing a motion for summary judgment, this court must consider the evidence in the light most favorable to the party opposing the motion. *Madison v. Deseret Livestock Co.,* 574 F.2d 1027 (10th Cir. 1978); *National Aviation Underwriters, Inc. v. Altus Flying Service, Inc.,* 555 F.2d 778 (10th Cir. 1977). Summary judgment should not be granted where different inferences can be drawn from conflicting affidavits and depositions. *Madison, supra.* This is particularly so where an issue turns on credibility. *Id.; National Aviation Underwriters, Inc., supra; Little Redhouse v. Quality Ford Sales, Inc.,* 511 F.2d 230 (10th Cir. 1975). Here, an issue central to Romero's prima facie case of discriminatory refusal to hire, his qualification for the position, was clearly disputed and should not have been resolved by summary judgment.

In addition, the trial court evaluated the statistics offered by the parties in the following manner:

> The following individuals before the Court in the affidavit submitted by plaintiff's attorney in support of plaintiff's opposition to defendants' Motions for Summary Judgment *substantiate that plaintiff was not treated more severely or given any greater punishment than Anglo employees similarly dismissed* for Rule G violation.
>
> (a) E. F. Finnerty dismissed 2/6/73, third violation, reinstated 10/1/76, or a total of 43 months out of service.
>
> (b) R. S. Cable dismissed 11/11/75, first offense, reinstated 8/10/76, or a total of nine months out of service.
>
> (c) G. R. Hayes dismissed 12/9/75, first offense, reinstated 8/27/76, or a total of nine months out of service.
>
> (d) F. L. Copiac dismissed 2/1/74, first offense, reinstated 12/17/75, or a total of 22 months out of service.

Rec., vol. I, at 374.

Despite the fact that two of the Caucasian employees on the above list were reinstated within nine months, as compared to fifteen months for Romero, the trial judge concluded that "the length of time the plaintiff was discharged was not disproportionately greater than other employees discharged under similar circumstances." Rec., vol. I, at 378. In reaching this conclusion, the judge totally ignored evidence in the Garcia report showing two additional instances in which Caucasian employees were apparently treated more favorably than Spanish surnamed employees in connection with rule violations, Rec., vol. I, at 264–265, as well as evidence supplied by the Union that one employee who cooperated with the treatment program was reinstated in 120 days. Rec., vol. I, at 116. Accordingly, whether Romero was treated differently in the length of his discharge because of his national origin presents a genuine issue of fact.

■ Finally, the question of retaliation is particularly inappropriate for summary judgment disposition, since the primary issue is one of intent and motive. *Jeffries v. Harris County Community Action Association,* 425 F.Supp. 1208 (S.D.Tex.1977); *Kornbluh v. Sterns & Foster Co.,* 73 F.R.D. 307 (S.D.Ohio 1976). There is evidence in the record to support an inference that the Railroad was adversely motivated by Romero's complaint to the EEOC, Rec., vol. I, at 261, 285, 286–287, 292, thus precluding summary judgment on this issue as well.

### B.

*Issues of fact pertaining to the Union's liability*

■ Title VII clearly prohibits a labor organization from failing to refer for employment or otherwise discriminating

against any individual because of his national origin or because he has filed a discrimination charge with the EEOC. 42 U.S.C. §§ 2000e–2(c), 2000e–3(a). Title VII creates an independent statutory right in favor of employees, and a union member need not pursue any separate labor contract or statutory avenues of redress he might have against the union or the company before resorting to his remedies under Title VII. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

Romero contends that the Union and the general chairman, defendant Murdock, violated Title VII by consenting to the Railroad's decision to impose a longer rehabilitation period upon Romero because of his national origin and in retaliation for his having filed an employment discrimination complaint. Rec., vol. I, at 45.

With respect to the issue of retaliation, the investigator for the Wyoming Commission stated in his affidavit that defendant Murdock told him "the company and the union were in the matter together and that if the complaint filed by Mr. Romero was not dropped against the company, the union would not pursue reinstatement in the same manner they would if the complaint were dismissed." Rec., vol. I, at 256. Romero testified in his deposition that Dick Tritt, the Union local chairman, said he would wash his hands of Romero if Romero filed an action with the EEOC. Rec., vol. IV, at 127. Romero also testified that Tritt refused to furnish him a copy of the transcript of his discharge hearing. Rec., vol. IV, at 159–161. It is undisputed that Tritt wrote a letter to the Union's general counsel seeking to ascertain whether Romero could be punished for complaining to the EEOC. Rec., vol. IV, at 130–131.

The affidavit of Kenneth Steven Tuma, ostensibly in support of the Union's motion for summary judgment, establishes that Tuma was a Union member from whom Romero sought advice about filing a discrimination complaint. Tuma stated he called general chairman Murdock to discuss the matter with him:

Upon reaching General Chairman Murdock and lodging a request that the advancement of the Plaintiff's case be confined to his ability to return to service with full payment for all time lost while withheld; *also, addressing my concerns about repercussions against our organization if a Civil Rights action was started.* I was informed by General Chairman Murdock that the Plaintiff's case would continue to be handled in the manner in which his office received it and that our organization's "skirts were clean" of any practices that would warrant filing of an EEO complaint. *The conversation continued with me being told of the Plaintiff's responsibilities and obligations towards his union in suppressing an action of this nature against the United Transportation Union. Needless to say the conversation ended in raised voices with neither party relenting their position.*

Rec., vol. I, at 253 (emphasis added).

Entries in the records of the Employee Assistance Program show that union members conferred with the Railroad about Romero filing the EEOC charge. Thus an August 17, 1976 report noted a contact by a union member named Mahlman and stated: "Mahlman said client considering EEO route. Told DDS [defendant Darrell D. Sorenson]." Rec., vol. I, at 285. It is obvious that the Union was disturbed by Romero's EEOC complaint. Rec., vol. I, at 286–287.

■ Considering the evidence in the light most favorable to the plaintiff, we find that it is sufficient to raise a genuine issue of fact on the question of union retaliation.

■ With respect to the assertion that the union consented to the Railroad's alleged discriminatory delay in reinstating Romero, we point out that labor organizations have an affirmative duty to insure compliance with Title VII. *Donnell v. General Motors Corp.*, 576 F.2d 1292 (8th Cir. 1978). If a union does not take action against discriminatory practices by an employer, it may be held responsible for those practices. *Gray v. Greyhound Lines East*, 178 U.S.App.D.C. 91, 545 F.2d 169 (D.C. Cir.

1976); *Patterson v. American Tobacco Co.*, 535 F.2d 257 (4th Cir. 1976); *Macklin v. Spector Freight Systems, Inc.*, 156 U.S.App. D.C. 69, 478 F.2d 979 (D.C. Cir. 1973).

Here the affidavits filed in support of defendants' motions for summary judgment show that the Union works closely with the Railroad in the process of reinstatement of employees who are enrolled in the Employee Assistance Program. Apparently rehabilitation progress reports are not drafted by an employee's counselor until the Union first requests reinstatement. Rec., vol. I, at 174. While the decision to reinstate rests with the Railroad, the record shows that the Union and the Railroad had numerous conferences about Romero's situation. Rec., vol. I, at 119–120, 187–189.

■ A union cannot acquiesce in a company's prohibited employment discrimination and expect to evade Title VII liability for such discrimination. *See Macklin, supra*, 156 U.S.App.D.C. at 78–79, 478 F.2d at 988–989. Given our conclusion that there are genuine issues of fact on the question of national origin discrimination by the Railroad, we cannot say at this stage of the proceedings that there are no such issues of fact with respect to the Union's involvement in the alleged discrimination.

## II.

### *Subject Matter Jurisdiction Under Title VII Over Individual Defendants*

By entering summary judgment in favor of all defendants, the trial court found by implication that subject matter jurisdiction exists under Title VII over the individual defendants notwithstanding the plaintiff's failure to name them in the EEOC charges filed against the Union and the Railroad. But we are unable to determine from this record whether subject matter jurisdiction is in fact present.

■ Section 706(f)(1) of the Act, 42 U.S.C. § 2000e–5(f)(1), provides that the aggrieved party may bring a civil action "against the respondent named in the charge . . . ," after exhausting administrative remedies. The filing of a timely charge of discrimination with the EEOC is a jurisdictional prerequisite to the institution of a lawsuit. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974). However, complaints to the EEOC must be liberally construed in order to accomplish the purposes of the Act, since such complaints are written by laymen not versed either in the technicalities of pleading or the jurisdictional requirements of the Act.

Some courts have recently recognized narrow exceptions to the strict requirement that each defendant must have been specifically named as the respondent in the EEOC charge where the defendant was informally referred to in the body of the charge, *Shehadeh v. Chesapeake & Potomac Telephone Co.*, 193 U.S.App.D.C. 326, 595 F.2d 711 (D.C.Cir.1978); *Eldredge v. Carpenters 46 Northern California Counties Joint Apprenticeship & Training Committee*, 440 F.Supp. 506 (N.D.Cal.1977); *Hanshaw v. Delaware Technical & Community College*, 405 F.Supp. 292 (D.Del.1975), or where there is sufficient identity of interest between the respondent and the defendant to satisfy the intention of Title VII that the defendant have notice of the charge and the EEOC have an opportunity to attempt conciliation. *Glus v. G. C. Murphy Co.*, 562 F.2d 880 (3d Cir. 1977); *Williams v. Massachusetts General Hospital*, 449 F.Supp. 55 (D.Mass.1978); *Stringer v. Pennsylvania*, 446 F.Supp. 704 (M.D.Pa.1978); *Flesch v. Eastern Pennsylvania Psychiatric Institute*, 434 F.Supp. 963 (E.D.Pa.1977). The court in *Glus* was convinced Congress did not intend that a complainant must ascertain at the time of filing charges each individual in a company who might be involved in the alleged discriminatory practices. Oftentimes such information would not be uncovered until the EEOC investigation.

■ Although this court has not previously addressed the issue, we are inclined to agree that omission of a party's name from the EEOC charge does not automatically mandate dismissal of a subsequent action under Title VII. Four factors are listed in *Glus* as pertinent to an evaluation of the failure to name a party before the EEOC:

**1312**

1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

562 F.2d at 888. Depending on the facts, additional factors may be relevant.

It is the province of the district court to initially consider such factors and make the determination of jurisdiction after each side has had an opportunity to fully address the question. On this issue, therefore, we remand the case for further proceedings in the district court to determine whether subject matter jurisdiction exists under Title VII over the individual defendants.

### III.

*Claim Pursuant to 42 U.S.C. § 1985(3)*

In granting summary judgment against Romero on his Title VII claims, the trial court failed to address his additional contention that defendants conspired to deprive him of his civil rights in violation of 42 U.S.C. § 1985 by retaliating against him for filing a complaint with the Wyoming Fair Employment Commission and the EEOC. *See* Rec., vol. I, at 47. On remand, this issue may become particularly pertinent if it is determined that subject matter jurisdiction is lacking under Title VII over some or all of the individual defendants. In this connection, we point out that this court has held state action not to be a necessary prerequisite to a Section 1985(3) claim. *Dry Creek Lodge, Inc. v. United States*, 515 F.2d 926, 931 (10th Cir. 1975). *See Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29

L.Ed.2d 338 (1971); *Marlow v. Fisher Body*, 489 F.2d 1057 (6th Cir. 1973).

Accordingly, the judgment of the district court is vacated and the case is remanded for further proceedings consistent with this opinion.

