Vicki **ANSPACH** and John Anspach, Plaintiffs,

v.

**TOMKINS INDUSTRIES, INC.,** Ruskins Division; Irvin Clements; Delmar Fischer; Robert Carey; Don Merwarth; Sheet Metal Workers' International Association, Local No. 2; and Mike Krasovec, Defendants.

Civ. A. No. 91–2279–EEO.

United States District Court, D. Kansas.

Feb. 11, 1993.

Memorandum and Order March 26, 1993.

Alan V. Johnson, Sloan, Listrom, Eisenbarth, Sloan & Glassman, W. Thomas Stratton, Topeka, KS, for plaintiffs.

Alison Armstrong, Michael F. Delaney, Spencer, Fane, Britt & Browne, Kansas City, MO, Nancy M. Landis, Spencer, Fane, Britt & Browne, Overland Park, KS, for defendants.

Kathleen A. McNamara, Frederic O. Wickham, Jolley, Walsh & Hager, P.C., Kansas City, MO, for Sheet Metal Workers' Intern. Ass'n, Local No. 2 and Mike Krasovec.

Bruce W. Kent, H. Dean Cotton, Kansas Dept. of Human Resources, Legal Unit, Topeka, KS, for Kansas Dept. of Human Resources.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

This matter is before the court on two motions for summary judgment, one filed on behalf of defendants Tomkins Industries, Clements, Fischer, Carey, and Merwarth (the "Company defendants"), and the other filed on behalf of defendants Sheet Metal Workers' International Association Local No. 2 and Mike Krasovec (the "Union defendants"). The material facts are uncontroverted unless otherwise noted. The uncontroverted facts pertinent to the first motion will be stated initially, and additional uncontroverted facts pertinent to the second motion will be noted in the second part of this opinion, which discusses the issues raised by that motion.

I. *Motion for Summary Judgment on Plaintiffs' Claims Against the Company Defendants*

Facts

1. The plaintiffs, John and Vicki Anspach, were employed in non-management positions by defendant Tomkins Industries, Inc., Ruskins Division ("the company"). They were husband and wife. John is now deceased. Irvin Clements was at all relevant times a vice president of the Ruskins division. Delmar Fischer served as plant manager of the company's plant in Parsons, Kansas, and subsequently became manager of the company's plant in Galesburg, Kansas. Robert Carey was at all relevant times the personnel manager responsible for the two plants. Don Merwarth was at all relevant times the general foreman of the Parsons plant.

2. Vicki's co-workers at the Parsons plant subjected her on numerous occasions to offensive and abusive sexual comments, gestures, practical jokes, and uninvited touchings. This treatment continued until Vicki quit her job at the plant. Vicki usually discussed these incidents with her husband, John, and complained to management about some of the occurrences.

3. After a co-worker made a remark to Vicki suggesting the two of them go to bed together, John took the individual to foreman Merwarth who told Vicki's co-worker to behave himself and get back on the job. Shortly thereafter, the worker was transferred to another department.

4. On July, 12, 1989, John complained to personnel manager Carey that the men were harassing Vicki at the time clock. John informed Carey that this was a real problem and it had been going on for a while. Carey convened a meeting with the leadmen (non-management supervisory personnel) on July 20, 1989, to discuss the problem of sexual harassment. At the meeting, Carey handed out a magazine article and memorandum on sexual harassment, and also distributed a copy of the corporate sexual harassment policy. Carey told the leadmen to read the article and censor behavior on the floor.

5. On one occasion, Vicki got a spark from welding in her eye and went to Carey to have the spark removed. Carey removed the spark and put drops in Vicki's eye. While putting in the drops, Carey made a remark to the effect he did not want this to turn into a wet T-shirt contest. Vicki considered the remark offensive.

6. On August 23, 1989, John met with company vice president Clements and informed him that the men were still sexually harassing Vicki. Clements told John he would take care of the problem and that John should let him know if it continued. That same day, Clements met with other management employees, including Fischer, Merwarth, and Carey. Clements told Carey to talk to the people Vicki had indicated were harassing her. Carey talked to at least two of the alleged offenders and told them to stop harassing Vicki.

7. On August 28, 1989, a vibrator was found in the women's restroom. Carey asked the employees about it, but they professed ignorance. Carey told the leadmen that this conduct would not be tolerated and that if he found out who put it there, that person would be terminated on the spot. The leadmen told Carey that he should talk to the employees directly because the problem was out of control. Carey stated that he would prepare a memo for distribution to all departments, but he did not follow through and do it. Carey considered the incident a

dumb, sick joke. Carey took no further action at that time because he thought the problem had been stopped.

8. On September 15, 1989, Vicki complained to general foreman Merwarth about continued harassment by the men at the time clock. On September 19, 1989, Merwarth told Vicki there was nothing he could do about the time clock situation, and suggested she wear less revealing clothing.

9. On September 20, 1989, John and Vicki came back from lunch to find a crowd lined up at the time clock. When Vicki walked up, the crowd began yelling at her and gesturing offensively. Vicki was very upset by their behavior, and was shaking badly as she went to her machine to begin work. Fifteen minutes later she left the plant in tears.

10. The same day, Carey investigated the time clock incident, conducting interviews with plant employees. He continued to investigate during the days following, and conducted more interviews on September 28, 1989. Carey gave verbal reprimands to everyone he interviewed. Carey sought the support of the Union and its members to end the problem, and eventually sought guidance from the corporate office in Dayton, Ohio, because he felt the situation was out of control. At this point, it was rumored that Vicki had filed administrative charges, so Carey was advised to interview the employees and keep notes of what he learned. Carey made a preliminary investigation, then turned it over to people in Dayton who were preparing the company's defense to Vicki's charges.

11. On September 21, 1989, Vicki filed charges of sexual harassment with the Kansas Commission on Civil Rights.

12. On September 22, 1989, obscenities were scrawled on the walls of the women's restroom at the plant. Carey had the writing painted over the same day. On September 25, 1989, more obscenities appeared on the walls, and Carey had them scraped off and a sign posted prohibiting further writing on the walls.

13. December 12, 1989, Vicki left work early due to a problem with her wrist. She was off work with this injury until January 17, 1990. The day Vicki returned to work, January 18, 1990, she ran her finger through her machine. Vicki was not injured, but was shaken up by the incident. She was told to operate her machine correctly by facing it (instead of facing another direction, which allowed her to stare into the adjacent department where her husband was working).

14. The same day, John and Vicki met with Fischer to see what was wrong with the way Vicki wanted to operate her machine. Fischer pointed out the safety problems and Vicki's wrist injury. The following day, Carey ran a safety test on Vicki's machine and she demonstrated to him how she wanted to operate the machine. Carey observed this, but told Vicki she needed to face the machine to operate it safely and correctly.

15. On January 23, 1990, Vicki left work at noon because she felt the problems at work were putting her under too much stress.

16. On January 25, 1990, Fischer demoted John from his leadman position. Fischer told John he was being demoted because of problems in his department. However, John believed (on information from a co-worker) that he was demoted because Fischer was unhappy about the trouble he and Vicki were causing the company. John asked Fischer what he was supposed to do—ask his wife to quit? Fischer replied that it would help and told John that he should be able to control his wife.

17. On January 25, 1990, Vicki saw John walk through her department on the way to his new assignment. This upset Vicki because she felt John had been demoted to upset her. She left work and told her supervisor that she was quitting. Later that day, she told Fischer that she thought the company was forcing her to quit and that John had been demoted to hurt her; she was crying and upset at the time.

18. Vicki saw a counselor on January 26, 1990. She sought treatment for stress, troubled sleep, headaches, difficulty concentrating, and crying spells. She saw a counselor three more times between then and March 1990.

19. On his new job assignment, John was asked to do work that was undesirable com-

pared to his previous duties. He felt he was given these jobs in retaliation for opposing the harassment Vicki suffered at the hands of company employees.

20. Vicki filed a claim for unemployment compensation on February 12, 1990. Carey contested her claim even though he had previously told her he would not. The Kansas Department of Human Resources Appeals Referee found in Vicki's favor. The same day the company learned of these results (April 16, 1990), John was given additional undesirable work assignments.

21. In January, the company purchased a plant in Galesburg, Kansas, and transferred some departments there.

22. On January 18, 1990, John withdrew from the Union.

23. On January 28, 1990, John was written up for a "bad attitude." Apparently, this arose out of John calling his leadman a bad name while arguing with a co-worker within earshot of the leadman. The write-up had originally been for poor production, but the charge was later changed to "bad attitude."

24. John was transferred to Galesburg on May 7, 1990. Subsequently, John was harassed by his co-workers, who called him a "scab" and put anti-scab stickers on his personal property. John's co-workers further harassed him by tossing hardware and flaming rags into his work area, and by putting glue and grease on his tools. John requested to be transferred back to Parsons, but Fischer denied the request, telling John the company needed the union labels on the products made in Parsons.

25. Vicki and John filed the instant action on July 29, 1991. That same day, John was sent out to do sandblasting in one hundred degree heat. John's foreman at Galesburg committed other acts that John considered retaliation: refusing to excuse attendance bonuses for time off to testify at depositions, complaining about John's work, and requiring a time study of John's work.

26. John claims that as a result of these incidents he suffered the following medical ailments: (1) two months before his deposition (taken in February 1992) he broke out in hives, and (2) one month prior to his deposition he had a case of "nerves" and sought treatment at a hospital. John complains of ulcer-like symptoms and takes Alka–Seltzer every night.

Discussion

Plaintiffs make several claims against the company defendants. Vicki Anspach alleges she was constructively discharged from her employment with defendant Tomkins Industries and that her constructive discharge resulted from discrimination against her on the basis of sex, as well as sexual harassment and an offensive and hostile work environment in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*, and the Kansas Acts Against Discrimination ("KAAD"), K.S.A. 44–1001, *et seq.* She further claims she was retaliated against for opposing sexual harassment and for filing a discrimination charge with the Kansas Commission on Civil Rights ("KCCR"). Finally, Vicki alleges state law tort claims of intentional infliction of emotional distress and negligence. Plaintiff John Anspach alleges that he was retaliated against in violation of Title VII and the KAAD for openly opposing sexual harassment and for aiding his wife, Vicki Anspach, in her proceedings before the KCCR. He also alleges state law tort claims of intentional infliction of emotional distress and negligence.

The company defendants (in this part of the opinion, simply "defendants") seek summary judgment on plaintiffs' state law claims of intentional infliction of emotional distress (also known as outrage) and negligence. Additionally, defendants assert that the state law claims are preempted by the Kansas Acts Against Discrimination and that neither plaintiff has a claim under the Civil Rights Act of 1991 because the alleged offending conduct occurred before the effective date of the Act.

A. *Intentional Infliction of Emotional Distress*

Defendants argue that the defendants' conduct was not extreme and outrageous and that plaintiffs did not suffer the severe emo-

tional distress requisite to recovery on their claims of intentional infliction of emotional distress, also known as the tort of outrage. Although the court has not detailed the numerous incidents of harassment that Vicki and John suffered at the hands of their co-workers, for the purposes of this motion, the court accepts as true the plaintiffs' factual allegations pertaining to the sexual harassment Vicki suffered and of the retaliation they both suffered. Viewing the evidence concerning these incidents in the light most favorable to the plaintiffs, the court must determine whether or not the defendants are entitled to judgment as a matter of law on the plaintiffs' claims of intentional infliction of emotional distress.

 Kansas recognizes a cause of action for intentional infliction of emotional distress:

One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress. Proof of four elements is required to establish the cause of action: (1) The conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's emotional distress; and (4) plaintiff's emotional distress must be extreme and severe.

Liability for extreme and outrageous distress has two threshold requirements which must be met and which the court must, in the first instance, determine: (1) whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by the plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it.

*Roberts v. Saylor,* 230 Kan. 289, 292–93, 637 P.2d 1175, 1179 (1981) (citations omitted); *Taiwo v. Vu,* 249 Kan. 585, 592, 822 P.2d 1024, 1029 (1991). The Kansas Supreme Court has narrowly circumscribed the bounds of this tort to include only that conduct "so outrageous in character, and so extreme in degree, as to go beyond the

bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society." *Id.* (quoting *Dotson v. McLaughlin,* 216 Kan. 201, 210, 531 P.2d 1, 8 (1975)).

Liability does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities. Members of the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind.

*Taiwo v. Vu,* 249 Kan. at 592, 822 P.2d at 1029 (quoting *Roberts,* 230 Kan. at 293, 637 P.2d at 1179).

 It should be noted at the outset that the company and the individual defendants are not vicariously liable for the outrageous conduct, if any, of the plaintiffs' non-management co-workers. Liability for intentional infliction of emotional distress will attach to these defendants only if *their own* conduct satisfies the above-stated elements of the cause of action. In other words, if plaintiffs are to recover, it must be because the conduct of the company or the individual defendants was extreme and outrageous, not simply because the plaintiffs may have been subjected to extreme and outrageous treatment by their co-workers. *See Williams v. Community Drive–In Theater, Inc.,* 214 Kan. 359, syl. 3, 520 P.2d 1296 (1974) (employer is not liable for the intentional torts of an employee unless they are committed while the employee is acting in the execution of his authority and within the course of his employment, or with a view to furtherance of his employer's business, and not with a purpose personal to the employee); *Hollinger v. Stormont Hosp. & Training School for Nurses,* 2 Kan.App.2d 302, syl. 2, 578 P.2d 1121 (1978) (employer not liable for injuries inflicted by one employee upon another employee when the act that caused the injury was not authorized by the employer, was not done to promote the employer's business, and was not part of the employee's duties). Plaintiffs cite *Hicks v. Gates Rubber Company,* 833 F.2d 1406 (10th Cir.1987), for the proposition that the defendants are vicariously liable for the acts of the employees who allegedly inflicted emotional distress upon the plaintiffs. Plain-

tiffs' reliance on *Hicks* is misplaced; *Hicks* was a Title VII case in which the court relied upon general agency principles to find that an employer can be liable under certain circumstances for an employee's sexual harassment of another employee. In the instant case, the issue is whether Kansas principles of agency and tort law permit an employer to be held vicariously liable for the extreme and outrageous treatment of one employee by another employee. Here, it is clear that under the principles enunciated in *Williams* and *Hollinger*, the company defendants cannot be held liable for the conduct of plaintiffs' non-management co-workers. Therefore, the court must evaluate the propriety of plaintiffs' outrage claims based upon the conduct of the defendants themselves, and not based upon any conduct committed by non-management employees (although conduct of the latter will be considered, where relevant, in evaluating the conduct of the defendants).

### 1. Vicki's Claim

Vicki contends that the defendants are liable for intentional infliction of emotional distress on essentially four grounds: (1) for condoning and participating in sexual harassment; (2) for retaliating against her because she opposed sexual harassment; (3) for opposing her claim for unemployment benefits; and (4) for demoting John in order to upset her.

■ The court must first determine whether the defendants' conduct was so extreme and outrageous as to permit recovery. With respect to Vicki's claim that the defendants participated in and condoned sexual harassment, the court does not find sufficient evidence in the record to support a finding that the defendants' conduct was extreme and outrageous. The only evidence conceivably indicating direct sexual harassment by a named defendant was when Carey, while putting eyedrops in the plaintiff's eye, told her he did not want it to turn into a wet T-shirt contest. Even if this comment is sexual harassment, it is a far cry from being extreme and outrageous. As to the defendants' condoning of sexual harassment, it is uncontroverted that on several occasions, the defendants responded to Vicki and John's com-

plaints of sexual harassment by taking steps (albeit unsuccessful) to remedy the problem. Management investigated incidents of harassment, issued verbal reprimands, and distributed literature designed to increase awareness and deter future misconduct. It is apparent that the defendants' actions were woefully inadequate to stop the harassment and resultant anxiety suffered by the plaintiffs. But even assuming that the defendants acted with poor judgment or even negligence, it cannot be said that their conduct in response to the situation was atrocious, utterly intolerable, or outrageous. This is simply not a case where the conduct in question was so extreme and beyond the bounds of all decency that the law must intervene. Notwithstanding the utterly reprehensible behavior of Vicki's co-worker's, the court finds the conduct of these defendants insufficient as a matter of law to subject them to liability for the intentional infliction of emotional distress.

■ Vicki also contends that the defendants inflicted emotional distress upon her by retaliating against her for opposing sexual harassment at the plant. She alleges this retaliation occurred when she was required to alter the method in which she operated her machine and was put through a safety test. She alleges further retaliation occurred when the company opposed her claim for unemployment benefits, and when John was demoted from his position as leadman. As before, the court is unable to find that the evidence supports a reasonable conclusion that the defendants are liable for the intentional infliction of emotional distress. None of these acts of purported retaliation, alone or collectively, rises to the level that sustains a claim of outrage. It may be that the company did retaliate against Vicki for opposing sexual harassment; that fact alone, however, is insufficient to establish that the defendants' conduct was extreme and outrageous. *See Rupp v. Purolator Courier Corp.*, 790 F.Supp. 1069, 1074 (D.Kan.1992); *Fletcher v. Wesley Medical Center*, 585 F.Supp. 1260, 1262 (D.Kan.1984). There must be something more, something about the manner in which the retaliation occurred, that makes the conduct actionable in tort,

**1508**

beyond merely supporting a claim for employment discrimination. The court must find, therefore, as a matter of law, that the defendants' conduct toward Vicki was not so extreme and outrageous that it subjects them to liability for the intentional infliction of emotional distress.

Because the first threshold requirement to plaintiff's claim for intentional infliction of emotional distress has not been satisfied, the court need not consider the second threshold requirement, that is, whether the plaintiff's distress was sufficiently severe, genuine and extreme that no reasonable person should be expected to endure it. *Roberts,* 230 Kan. at 294, 637 P.2d at 1179. Nevertheless, the court has reviewed the evidence on this point and is of the view that reasonable persons could disagree whether Vicki's emotional distress was sufficiently severe and extreme to sustain her claim. Therefore, this point is not a basis upon which to sustain the defendants' motion for summary judgment.

Accordingly, the court concludes that in view of the uncontroverted material facts, the defendants are entitled to summary judgment on Vicki's claim of intentional infliction of emotional distress.

#### 2. John's Claim

■ As an initial matter, the court notes that John's claim for intentional infliction of emotional distress survives his death. *Gross v. Van Lerberg,* 231 Kan. 401, 404, 646 P.2d 471, 474 (1982) (citing K.S.A. 60–1801).

John bases his claim for intentional infliction of emotional distress on the following incidents: (1) the defendants' participation in and condonation of the sexual harassment of his wife; (2) the defendants' retaliation against him for opposing the harassment, specifically, by demoting him, by giving him undesirable work assignment, by denying him retransfer to the Parsons plant, and by denying his grievances; and (3) his co-workers' harassment of him on the job in connection with his withdrawal from the Union.

■ John's claim that the defendants participated in and condoned sexual harassment of his wife, and thereby inflicted emotional distress upon him, is necessarily weaker than

Vicki's similar claim because John was not sexually harassed. The court is aware that a tortfeasor can be liable for intentional infliction of emotional distress upon a third person as a result of conduct directed toward a member of the third person's immediate family. *See Wiehe v. Kukal,* 225 Kan. 478, 481, 592 P.2d 860, 863 (1979). However, if the defendants' conduct was insufficiently outrageous for Vicki to recover, then it can be said with certainty that the defendants did not act toward John in a manner that was extreme and outrageous. As stated in connection with Vicki's claim, the defendants' actions were obviously inadequate to prevent the harassment, and the behavior of the workers toward Vicki was reprehensible. But even so, those facts alone do not establish that the defendants are liable to John for the intentional infliction of emotional distress. The uncontroverted facts in this case establish as a matter of law that the defendants are not liable to John for outrage in connection with the harassment of his wife by company workers.

■ Likewise, with respect to John's outrage claim arising out of acts of retaliation by the company, the court is unable to conclude that the conduct of the defendants was sufficiently outrageous to permit recovery in tort beyond the standard action for employment discrimination. Each of the defendants' actions alleged to be retaliatory was an ordinary business decision of the sort made every day by employers across the nation. These actions were not extreme and outrageous, nor is the fact that they may have been taken with illegal motive of retaliation enough to make them so. *See Rupp v. Purolator Courier Corp.,* 790 F.Supp. 1069, 1074 (D.Kan.1992); *Fletcher v. Wesley Medical Center,* 585 F.Supp. 1260, 1262 (D.Kan.1984).

Finally, to the extent John's outrage claim arises out of harassment by his co-workers for dropping out of the Union, the issue of vicarious liability has already been addressed in this opinion, and the defendants must prevail on this point. To the extent John's claim is predicated upon the company's failure to prevent the harassment or inadequacy of response to the union-related harassment, the

court finds as a matter of law that the company's actions were not outrageous.

■ John also fails to meet the second threshold requirement on his claim of intentional infliction of emotional distress. Assuming John actually suffered the distress he claims to have suffered, the distress simply does not rise to a level sufficiently extreme and severe to sustain his claim. John's distress did not occur for months after the conduct he asserts induced the anxiety. Moreover, John has produced no medical documentation of any emotional or physical effects that can be associated with the defendants' actions. In short, John's allegations that he had a case of "nerves" and broke out in hives, even if true, do not establish that his emotional distress was so genuine, severe, and extreme as to result in liability.

Accordingly, the court must conclude that the defendants are entitled to summary judgment on John's claim for the intentional infliction of emotional distress.

## B. *Negligence Claims*

Both John and Vicki assert a claim against the defendants for negligence. The gist of plaintiffs' position is that the defendants were negligent in the supervision and retention of their co-workers, and that the defendants are liable for the negligent infliction of emotional distress. The defendants argue that Kansas does not recognize the tort of negligent supervision and retention in this context, and that since the plaintiffs suffered no physical injury, they cannot recover for the negligent infliction of emotional distress.

With respect to plaintiffs' negligent retention and supervision claims, the holding of the Tenth Circuit Court of Appeals in *Polson v. Davis* is dispositive. *See Polson v. Davis,* 895 F.2d 705, 710 (10th Cir.1990). Faced with an employee alleging that her employer was negligent in supervising her immediate superior, thereby allowing him to violate her civil rights, the *Polson* court held that the Kansas courts would not permit recovery on the theory of negligent supervision. *Id.* The court observed: "This cause of action, once recognized, would necessarily arise any time a middle level supervisor engaged in

discriminatory conduct. We think it unlikely that the Kansas courts would adopt a liability rule with such broad implications." *Id.* We agree with these views, and the plaintiffs' claims for negligent supervision and retention cannot stand.

■ Plaintiffs assert that their claim for negligent infliction of emotional distress is viable, even absent resultant physical injury, because the conduct of the defendants was wanton. If plaintiffs' theory is to be accepted, it is not clear how the negligence claim would be anything but a reiteration of plaintiffs' intentional infliction of emotional distress claim, which asserts liability on the basis of intentional or reckless disregard of plaintiffs' rights. In fact, the authority plaintiffs cite in support of their position exposes the infirmity of their theory: "The general rule of negligence has no application to willful or wanton wrongs." *Bowman v. Doherty,* 235 Kan. 870, syl. 2, 686 P.2d 112 (1984). It is not clear whether plaintiffs also take the position that the defendants are liable for simple negligent infliction of emotional distress (arising out of conduct that was *not* wanton). To the extent the negligence claims are not based upon intentional or wanton conduct, in the absence of contemporaneous resultant physical injury, the claims cannot stand. *Hoard v. Shawnee Mission Medical Center,* 233 Kan. 267, 274, 662 P.2d 1214, 1219–20 (1983).

Therefore, summary judgment will be entered for the defendants on plaintiffs' negligence claims.

## C. *Applicability of the Civil Rights Act of 1991*

Plaintiffs concede that the Civil Rights Act of 1991 does not apply to Vicki's claims. Defendants argue that the Act is likewise inapplicable to John's claims. Plaintiffs' entire response is that John "does have a viable claim under the 1991 Act, inasmuch as his claim is based in part on acts of retaliation occurring after [the] effective date of the 1991 Act." Plaintiffs do not provide the court with any authority in support of this position, nor do they discuss the extent to which the 1991 Act will apply. The defen-

dants make no reply to plaintiffs' assertion that John has a claim under the 1991 Act.

The court will reserve ruling on this point until the parties have provided the court with adequate briefing on the issue. The parties are instructed that they should submit briefs to the court on this issue no later than ten (10) days before the trial is scheduled to begin. The court will then promptly make its ruling on this issue.

### D. *Survival of John's Title VII Claims*

 The defendants have moved to dismiss John's Title VII claims on the grounds that these claims do not survive his death. The relevant statute for survival of actions in Kansas provides that personal injury actions survive the plaintiff's death. K.S.A. 60–1801. John's claims, therefore, survive. *See Slade v. United States Postal Service*, 952 F.2d 357, 360 (10th Cir.1991) (plaintiff's Title VII claim survived his death under applicable Oklahoma statute for survival of personal injury actions).

Accordingly, defendants' motion to dismiss John's Title VII claims is denied.

### Conclusion

For the above stated reasons, defendants are granted summary judgment on plaintiffs' state law claims of intentional infliction of emotional distress and negligence. Because the uncontroverted facts demonstrate that, as a matter of law, the plaintiffs are not entitled to prevail on these claims, the court finds it unnecessary to consider defendants' arguments that the state law causes of action are preempted by the KAAD and the exclusivity of Worker's Compensation.

### II. *Claims Against the Union Defendants*

Additional Facts Pertinent to the Claims Against the Union Defendants

27. Defendant Sheet Metal Workers International Association, Local Union No. 2 (the "Union"), was at all relevant times the exclusive bargaining representative for the company's bargaining unit employees working at the Parsons and Galesburg plants. Mike Krasovec served as the Union's business representative to company employees until August 1990. Robert Brown was the chief union steward. John and Vicki were members of the bargaining unit prior to John's withdrawal from the Union and Vicki's termination of employment.

28. In August 1989, John spoke to Krasovec about sexual harassment going on at the plant, and specifically about objectionable behavior at the time clock. Krasovec promptly took this complaint to plant manager Fischer, who advised Krasovec that the problem was being addressed.

29. On September 19, 1989, Vicki spoke to general foreman Merwarth in his office. Vicki complained about sexual harassment at the time clock. Merwarth told her there was nothing he could do. Merwarth spoke to chief union steward Brown about the conversation with Vicki. Merwarth also talked to Glen Henderson, another union steward, about his conversation with Vicki.

30. On the evening of September 20, 1989, John and Vicki reported to Krasovec the time clock incident that had occurred earlier that day. Vicki told Krasovec that she had consulted with private counsel and that she would be filing a complaint with the KCCR. Krasovec discouraged Vicki from filing a complaint, saying that she should wait to see what happens; that it would only lead to more problems; and that the Union would hate to represent union members against each other. Vicki did not ask the Union to file a grievance or complaint on her behalf.

31. During their conversation on September 20, 1989, Vicki informed Krasovec that she had a list of names, times, and dates documenting the incidents of sexual harassment at the plant. The next day, Krasovec told employees at the plant that Vicki had a list of the people who had harassed her. Vicki felt that after this, the work environment was more hostile.

32. Krasovec spoke to company officials regarding the time clock incident. Krasovec and the Union attempted to address the problem by speaking to the union membership at union meetings. Krasovec explained to the union members that sexual harassment was inappropriate in the workplace.

Union attorney Peggy McNieve also spoke on this topic at a union meeting.

33. After the events at the time clock on September 20, 1989, Vicki spoke to chief union steward Robert Brown and asked him to make a complaint to management. Brown talked to Carey. Brown did not make an independent investigation of the incident.

34. Other than those already mentioned, Vicki did not bring further complaints of harassment to the Union. Vicki did complain of perceived retaliation when she was told to face a different direction while operating her machine. The Union advised her that she did not have a meritorious complaint because the company had a right to direct how the machines were operated and because she had not been disciplined for operating the machine incorrectly.

35. Robert Brown was present at the January 24, 1989, meeting when John was demoted by plant manager Fischer. Fischer told John that he could not have John in the leadman position because of the trouble he and Vicki were causing. After the meeting, John talked to Brown and asked him to file a grievance over the demotion. Brown discouraged John from filing a grievance, saying that the company had a right to appoint its leadmen.

36. After the company purchased the Galesburg plant, the company and the Union negotiated an oral agreement regarding transfer of those employees back to Parsons who were unhappy about the move to Galesburg. The general terms of this oral agreement were that employees in equivalent jobs could trade plants, provided that it was mutually agreeable. Alternatively, Galesburg employees who wanted to work in Parsons were put on a list so that when a position opened in Parsons, the employee could transfer back to Parsons, assuming the employee was qualified to fill the opening. The intent of the company and the Union was to complete all retransfers within one year.

37. John was moved to Galesburg on May 7, 1990. He put his name on the list of employees seeking transfer back to Parsons. The company and the Union each had a copy of the list.

38. On June 28, 1990, Krasovec told the union stewards at Galesburg that John had withdrawn from the Union. That same afternoon, one of the stewards (who was also John's leadman) had John disciplined with a written warning from the plant foreman. John was written up for "bad attitude" after he allegedly called his leadman a bad name during a conversation with Gary LaForge.

39. On July 2, 1990, John filed a grievance over the write-up for "bad attitude." The matter proceeded to a grievance hearing.

40. On July 24, 1990, Vicki filed a complaint against the Union and Krasovec with the KCCR. She alleged that the Union and Krasovec had condoned or participated in sexual harassment; that they failed to fairly represent her in grievances; and that they retaliated against her for opposing discrimination.

41. On August 21, 1990, the company had a grievance hearing on John's write-up for "bad attitude." John denied calling the leadman a bad name. LaForge was on vacation and did not testify at the hearing. No one from the Union had talked to LaForge about the incident. John's grievance was denied the next day.

42. In September 1990, scab stickers began to appear at the Galesburg plant. John complained to the general foreman, who had the stickers removed. On September 27, 1990, someone put a scab sticker on John's car.

43. On December 12, 1990, John filed a second grievance against the company arising out of his demotion from the leadman position. A grievance hearing was held on January 17, 1990, but John was not present. The grievance was denied.

44. On May 10, 1990, John filed his third grievance against the company. John alleged discrimination on the grounds that he was the only one on the list of employees seeking transfer back to Parsons who had not been moved. The company denied his grievance because John had not bid the jobs as required by the collective bargaining agreement. On June 23, 1991, the Union requested a grievance hearing. John at-

tempted to get a copy of the entire list, but no one from management or the Union could produce a copy.

45. On July 19, 1991, the company held a fact finding meeting regarding John's complaints that he was being harassed by his coworkers for withdrawal from the Union. Brown attended the meeting between John, the plant foremen, and Gary McNickle, who was one of the employees John accused of harassment. The plant foremen told John and Gary that it was getting out of hand and beyond a practical joke, and that they should stop the horseplay and get back to work. No further disciplinary action was taken. John testified at his deposition (in February 1992) that the harassment was still going on.

46. On September 18, 1991, John asked the Union about the status of his grievance concerning retransfer to Parsons. John got no response from the Union, so he wrote a letter to the Union on October 14, 1991, requesting a hearing.

47. Unbeknownst to John, a hearing on his grievance had already been held on October 8, 1991. John had not been notified of the hearing date. Prior to the hearing, the Union made no effort to locate the list of employees who had sought retransfer.

48. The grievance was denied on October 16, 1991, on the grounds that John had not

bid any jobs as required by the collective bargaining agreement.

Discussion

Plaintiffs assert several claims against the Union defendants (in this part of the opinion, simply "defendants"). Vicki asserts the following claims against the defendants: (1) that they violated Title VII and the KAAD by condoning or participating in sexual harassment and by retaliating against her for opposing illegal harassment; and (2) that the defendants subjected her to the intentional infliction of emotional distress, by participating in or condoning sexual harassment, and by refusing to assist her in opposing sexual harassment. John alleges: (1) that the defendants breached their duty of fair representation; and (2) that the defendants subjected him to the intentional infliction of emotional distress.

A. *John and Vicki's Claims for the Intentional Infliction of Emotional Distress*

1. Preemption

■ Defendants argue that plaintiffs' state law claims against the Union are preempted by section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.[1] Defendants' reliance on section 301 is misplaced; plaintiffs do not allege any violation of the collective bargaining agreement by either the company or the Union, so their suit is not one encompassed by section 301.[2]

---

1. Defendants erroneously identify § 301 as being part of the National Labor Relations Act, 29 U.S.C. §§ 151–69. The court construes their argument as being that the plaintiffs' state law claims are preempted by the Labor Management Relations Act, of which § 301 is a part.

2. The Supreme Court explained the nature of the hybrid § 301/breach of duty of fair representation suit in *DelCostello v. Teamsters*, 462 U.S. 151, 163–64, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1982). An individual employee may bring suit against his employer for breach of a collective bargaining agreement. Ordinarily, the employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement. This requirement, however, works an injustice when the union representing the employee in the grievance arbitration procedure acts in a discriminatory,

dishonest, arbitrary, or perfunctory fashion in breach of the duty of fair representation. In such an instance, the employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance/arbitration procedure. The suit against the employer rests on § 301, since the employee is alleging breach of the collective bargaining agreement. The suit against the union is one for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act. *Id.*

Plaintiffs in the instant case assert no claims against the Union or the company for breach of the collective bargaining agreement, nor do they allege any facts that would support such a claim. Their state law claims are therefore not preempted by § 301.

The apparent intent of the defendants is to argue that the plaintiffs' state law claims are preempted by federal labor law, and specifically the National Labor Relations Act. The gist of this argument is that the acts which allegedly subject the defendants to liability under state law are no different than those required to establish breach of the duty of fair representation, and therefore federal law preempts the state causes of action.

In *Farmer v. United Brotherhood of Carpenters and Joiners*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1976), the Supreme Court considered whether the National Labor Relations Act preempted a California cause of action for the intentional infliction of emotional distress. The court noted the general rule that when activities which a state purports to regulate are protected by section 7 of the NLRA, or constitute an unfair labor practice under section 8, state jurisdiction must yield in deference to the federal enactment. *Id.* at 296, 97 S.Ct. at 1061. This rule is not absolute, however, as the Court will refuse to apply the preemption doctrine if the regulated activity is merely a "peripheral concern" of the federal enactment or "touche[s] interests so deeply rooted in local feeling that, in the absence of compelling congressional direction, [the Court] could not infer that Congress had deprived the States of the power to act." *Id.* at 296–97, 97 S.Ct. at 1061. One such exception to the preemption rule has been recognized in the case of violent tortious activity, primarily because state court actions to redress injuries caused by violence or threats does not fetter the exercise of rights protected by the NLRA or effective administration of the federal scheme. *Id.* at 299–300, 97 S.Ct. at 1063. In light of these principles, the Court held that the plaintiff's claims of intentional infliction of emotional distress fell within the exception to federal preemption.

The Tenth Circuit Court of Appeals considered the scope of the *Farmer* holding in deciding the case of *Viestenz v. Fleming Companies, Inc.*, 681 F.2d 699, *cert. denied,* 459 U.S. 972, 103 S.Ct. 303, 74 L.Ed.2d 284 (1982). The plaintiff in *Viestenz* alleged intentional infliction of emotional distress in connection with his discharge from employment. The district court had refused to dismiss the plaintiff's claim for lack of jurisdiction, relying on the *Farmer* exception to preemption. In reversing the district court, the court of appeals noted that the Supreme Court in *Farmer* had emphasized several limitations on this exception to the general preemption rule. *Id.* at 703. These limitations include where the state interest is not substantial, or "where the emotional distress and anxiety resulted from actual or threatened loss of employment itself, rather than from the particularly abusive manner in which the employment loss was accomplished or threatened." *Id.* The *Viestenz* court concluded that the plaintiff's emotional distress had resulted from the fact of his discharge, rather than from any abusive conduct that could be attributed to defendants. Therefore, the state law claim was preempted by the federal scheme and should have been dismissed.

Applying the principles enunciated in *Farmer* and *Viestenz*, the court finds that the plaintiffs' claims against the Union for intentional infliction of emotional distress are preempted by the NLRA. Plaintiffs' claims against the Union are based upon the Union's alleged participation in and condonation of sexual harassment, the Union's refusal to assist Vicki in opposing sexual harassment, and the Union's failure to adequately represent John in his dealings with the company. As the Supreme Court explained in *Farmer:*

Union discrimination in employment opportunities cannot itself form the underlying "outrageous" conduct upon which the state-court action is based; to hold otherwise would undermine the pre-emption principle. Nor can threats of such discrimination suffice to sustain state court jurisdiction. It may well be that the threat, or actuality, of employment discrimination will cause a union member considerable emotional distress and anxiety. But something more is required before concurrent state court jurisdiction can be permitted. Simply stated, it is essential that the state tort be either unrelated to employment discrimination or a function of the particularly abusive manner in which the discrimination is accomplished or

threatened rather than a function of the actual or threatened discrimination itself. *Farmer*, 430 U.S. at 305, 97 S.Ct. at 1066. Here, the plaintiffs have not produced evidence of the "something more" that would exempt the state tort claims from federal preemption. If plaintiffs' injury can be attributed to any conduct by the defendants, it is attributable to conduct regulated by federal law, and does not arise from the particularly abusive nature of that conduct.

Because the court concludes that the plaintiffs' claims for the intentional infliction of emotional distress are preempted by federal law, the court must grant summary judgment to the defendants on these claims.

## 2. Sufficiency of the Outrage Claims

Even if the plaintiffs' outrage claims were not preempted by federal law, the court would nonetheless enter summary judgment in favor of the defendants on the grounds that under the uncontroverted facts in this case, plaintiffs are not entitled to recover on these claims as a matter of law.

■ Initially, the court notes that the defendants are not liable for the actions of plaintiffs' union co-workers who were not representatives or agents of the Union. *See Kux Mfg. Co. v. N.L.R.B.*, 890 F.2d 804, 809 (6th Cir.1989) ("a union is not responsible for the acts of an employee, unless the employee is an agent of the union," or where the union has "instigated, authorized, solicited, ratified, condoned or adopted" the conduct).

■ The uncontroverted facts establish that Vicki cannot prevail on her claim for intentional infliction of emotional distress. She alleges that the defendants facilitated or aided in harassment and retaliation and failed to assist her in opposing discrimination. These allegations, even if true, fall well short of establishing extreme and outrageous behavior. Vicki makes much of the fact that Krasovec told company employees that she had a list of those employees who had harassed her and that thereafter the work environment was more hostile. Krasovec's conduct, even assuming it resulted in the alleged hostility, is not activity atrocious and utterly intolerable in a civilized society. The evidence is insufficient to show that any conduct which can be attributed to the defendants was outrageous.

■ The same is true of John's claim against the Union defendants for intentional infliction of emotional distress. John's allegations pertaining to this claim primarily concern the harassment to which he was subjected after withdrawal from the Union. As discussed above, the Union is not responsible for the acts of individual union members not agents of the Union, no matter how offensive or inappropriate. Taking all the activity of the Union defendants and viewing it in the light most favorable to the plaintiff, the court simply cannot characterize it as extreme and outrageous. Moreover, as discussed in connection with John's similar claim against the company defendants, John has also failed to demonstrate that he suffered emotional distress sufficiently extreme and severe to permit recovery.

Therefore, the defendants are entitled to summary judgment on the plaintiffs' claims for the intentional infliction of emotional distress.

## B. *John's Claim for Breach of the Duty of Fair Representation*

### 1. Sufficiency of the Claim

"A breach of the statutory duty of fair representation occurs only when the union's conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1966).

■ The court finds that issues of material fact preclude summary judgment on this claim. Plaintiff's evidence, if believed, would support a reasonable conclusion that the Union breached its duty of fair representation by failing to adequately represent him in grievance proceedings with the company. Therefore, summary judgment against the Union would be inappropriate. However, the plaintiff has cited no authority, nor is the court aware of any, that would support a finding that Krasovec is liable in his individual capacity on this claim.

Accordingly, defendant Krasovec is awarded summary judgment on plaintiff's claim for breach of the duty of fair representation, but otherwise the defendants' motion on this claim is denied.

### 2. Statute of Limitations

Defendants argue that the statute of limitations applicable to fair representation actions bars the plaintiff's claim.

 The statute of limitations applicable to actions for breach of the duty of fair representation is six months. *DelCostello v. Teamsters,* 462 U.S. 151, 169, 103 S.Ct. 2281, 2293, 76 L.Ed.2d 476 (1983); *Erkins v. United Steelworkers of America,* 723 F.2d 837, 839 (11th Cir.), *cert. denied,* 467 U.S. 1243, 104 S.Ct. 3517, 82 L.Ed.2d 825 (1984); *Ray v. W.S. Dickey Clay Mfg. Co.,* 584 F.Supp. 1225, 1227 (D.Kan.1984). The continuing violations doctrine is applicable to these actions. *See Lewis v. Local Union No. 100 of the Laborers' Int'l Union,* 750 F.2d 1368, 1378–79 (7th Cir.1984).

In light of the court's conclusion that material issues of fact preclude summary judgment on plaintiff's fair representation claim, the court must find, at least for now, that the statute of limitations is satisfied as to these claims. If plaintiff's allegations are true, a violation of the duty of fair representation occurred within the statutory period and the action is timely as a continuing violation.[3]

Therefore, defendants' motion for summary judgment on the basis of the statute of limitations must be denied.

### 3. Damages for Emotional Distress

 John asserts he is entitled to recover damages for emotional distress caused by the Union's breach of the duty of fair representation, citing *Farmer v. ARA Services, Inc.,* 660 F.2d 1096, 1107 (6th Cir.1981). In *Farmer v. ARA Services,* the court held that when a union breaches its statutory duty of fair representation, it may be held jointly and severally liable with the employer for damages, including those to remedy emotional and mental distress. *Id.*

In *Baskin v. Hawley,* 807 F.2d 1120 (2nd Cir.1986), the Second Circuit Court of Appeals held that, in a fair representation case, a union may not be required to pay damages for the infliction of emotional distress unless its conduct has been truly outrageous. *Id.* at 1133; *accord Soto Segarra v. Sea–Land Service, Inc.,* 581 F.2d 291, 297–98 (1st Cir. 1978); *De Arroyo v. Syndicato De Trabajadores Packinghouse, AFL–CIO,* 425 F.2d 281, 293 (1st Cir.), *cert. denied,* 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114 (1970).[4] In reaching this conclusion, the Second Circuit Court of Appeals analyzed the balance the law must strike between the employee's interest in full compensation and the undesirability of " 'impair[ing] the financial stability of unions and unsettl[ing] the careful balance of individual and collective interests . . . in the unfair representation area.' " *Id.* (quoting *International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 48–52, 99 S.Ct. 2121, 2125–28, 60 L.Ed.2d 698 (1979)).

---

**3.** The court is satisfied that the alleged course of conduct is related closely enough to constitute a continuing violation according to the standards accepted in this circuit. *See Bruno v. Western Elec. Co.,* 829 F.2d 957, 961 (10th Cir.1987); *Furr v. AT & T Technologies, Inc.,* 824 F.2d 1537, 1544 (10th Cir.1987).

**4.** Although the Ninth Circuit Court of Appeals expressly reserved this question, the *Baskin* view is consistent with the holding in *Bloom v. Int'l Brotherhood of Teamsters Local No. 468,* 752 F.2d 1312, 1315 (9th Cir.1984). In *Bloom,* the court reserved the question of whether the remedy for a breach of the duty of fair representation might appropriately include damages for emotional distress. The court also reserved the question of whether an award of emotional distress damages would require both outrageous conduct and physical injury. The court's holding, however, in spite of its cryptic nature, strongly suggests that the Ninth Circuit, were it to reach the ultimate question on recoverability, would join those courts holding that outrageous conduct is a prerequisite to recovery of emotional distress damages in a fair representation suit:

> If, in a breach of the duty of fair representation case, insufficient outrageous conduct exists also to sustain a direct suit for infliction of emotional distress, we conclude that insufficient facts exist to support an award of damages measured by emotional distress as a remedy for the breach itself. The minimum level of outrageous conduct was not shown in this case. We can therefore reject the union members' damage theory on this ground alone.

*Id.* at 1315.

The requirement that the union's conduct be outrageous before a plaintiff may recover damages for emotional distress strikes this balance.[5]

The uncontroverted facts will not support a conclusion that the Union's conduct toward John was extreme and outrageous; this point was fully discussed earlier in the court's opinion. Accordingly, the court concludes that as a matter of law John is not entitled to damages for emotional distress arising out of his fair representation claim. Summary judgment must be entered for the defendants on this point.

As to attorney's fees, the plaintiff will not be entitled to recover attorney's fees unless he can demonstrate an applicable exception to the American Rule. *See Volkman v. United Transp. Union,* 770 F.Supp. 1455, 1475 (D.Kan.1991).

### C. *Vicki's Claims Under Title VII and the KAAD*

■ Vicki seeks to hold the Union liable under Title VII and the KAAD for participating in and condoning sexual harassment and retaliation. In support of her allegations, she argues (as evidence of discrimination) that the Union participated in or condoned sexual harassment, thereby creating a hostile work environment; that the Union failed to fairly represent her in her complaints against the company; and that the Union retaliated against her by failing to fairly represent her and by discriminating against John.

Title VII makes it unlawful for a labor organization to discriminate against an individual on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(c)(1). It is also illegal for a union to cause or attempt to cause an employer to discriminate against a member of one of the protected classes. 42 U.S.C. § 2000e–2(c)(3).

The uncontroverted facts do not support a reasonable conclusion that the Union committed direct discrimination against Vicki in violation of Title VII. There is no indication in the record that Krasovec or the Union sexually harassed Vicki. Although she asserts that her work environment became more hostile after Krasovec advised management that she was keeping a list of the offenders, this allegation, even if true, does not support a finding that Krasovec or the Union *caused* the company to discriminate against her on the basis of her sex. As to retaliation by the Union, while generally it is possible to find retaliation when a union refuses to represent an employee because the employee has opposed illegal discrimination by the employer, *see Romero v. Union Pacific Railroad,* 615 F.2d 1303, 1310 (10th Cir. 1980), the facts do not support such a finding in this case. The uncontroverted evidence shows that Krasovec responded to Vicki's complaints by taking her concerns to management. The first time Vicki spoke to Krasovec about sexual harassment was on September 20, 1989, after the time clock incident. Krasovec spoke to the union membership about sexual harassment the next day. Union attorney Peggy McNieve was also brought in to speak to the union membership. Vicki did not again complain to the Union until January 1990, when she expressed a concern that the company had retaliated against her by changing the way she operated her machine. The Union took no action on this complaint because of its view that the company is entitled by the collective bargaining agreement to prescribe the manner in which equipment is operated, and because Vicki was not disciplined for operating the machine incorrectly. The next time Vicki came to the Union, it was to request a meeting so she could resign her position with the company.

The uncontroverted evidence in the case does not support a reasonable conclusion that

---

5. The holding in *Farmer v. ARA Services, Inc.,* 660 F.2d at 1096, is not persuasive authority for a contrary conclusion. Although the opinion does not mention any requirement of outrageous conduct as a prerequisite to recovery, courts in the Sixth Circuit have limited the sweeping implications of the decision by construing it in light of other decisions that did. *See Nitzsche v. Stein,*

*Inc.,* 797 F.Supp. 595, 599 (N.D. Ohio 1992) ("The courts which have followed this line of reasoning [allowing recovery of emotional distress damages in fair representation suits] have cautioned, however, that such damages should only be awarded where the union's conduct is extreme and outrageous.") (citing, *e.g., Baskin,* 807 F.2d at 1133; *Bloom,* 752 F.2d at 1315).

Krasovec or the Union discriminated or retaliated against Vicki, or that they caused the company to do so. Accordingly, the court finds that defendants are entitled to prevail as a matter of law on Vicki's claim of direct discrimination in violation of Title VII. Because plaintiff's claims under the KAAD mirror her claims under Title VII, summary judgment for defendants is also appropriate on plaintiff's KAAD claims.

Plaintiff asserts, as an independent basis for the Union's Title VII liability, that the Union acquiesced in the company's unlawful treatment of her. The law in this circuit is that a union's acquiescence in unlawful discrimination by an employer can expose the union to liability under Title VII: "If a union does not take action against discriminatory practices by an employer, it may be held responsible for those practices. ... A union cannot acquiesce in a company's prohibited employment discrimination and expect to evade Title VII liability for such discrimination." *Romero*, 615 F.2d at 1310–11. This court is not of the view, however, that the *Romero* court intended that a labor organization be held vicariously liable any time an employer commits prohibited discrimination. In *Romero*, there was evidence that the union and the employer were "in the matter together" in delaying Romero's reinstatement because of his natural origin and in retaliation for his having filed a complaint with the EEOC. The court of appeals noted that the union had considerable input on reinstatement, and that the employer and the union had numerous conferences about Romero's situation. There was also evidence that the union threatened Romero that if he refused to dismiss his complaint, the union would wash its hands of him and would not pursue his reinstatement vigorously; moreover, there was evidence that union representatives asked whether they could punish Romero for complaining to the EEOC. Because the court found issues of material fact

with respect to the employer's liability under Title VII, it could not conclude on summary judgment that there were "no such issues of fact with respect to the union's involvement in the alleged discrimination." *Id.* at 1311.

The holding in *Romero* cannot be read to impose vicarious liability on a union simply because an employer commits illegal discrimination against an employee. Introducing the discussion on this point, the *Romero* court pointed out that "labor organizations have an affirmative duty to insure compliance with Title VII." *Id.* at 1310. It is breach of that duty which gives rise to union's liability; the union is responsible for its own actions, not for those of the employer. If the union fails to oppose sexual harassment, *Romero* stands for the proposition that the union is liable because of its failure to do so, not merely because the discrimination occurred.[6]

Applying the foregoing principles to the uncontroverted facts in this case, the court is unable to find that the defendants acquiesced in discrimination or retaliation by the company. Whenever Vicki or John brought a valid complaint to the Union, the Union responded by taking the issue to management. Additionally, the Union attempted on at least two occasions to stem future harassment by educating union members about inappropriate and prohibited conduct. The only complaint of retaliation Vicki brought to the Union arose out of her failure to operate company equipment correctly. Because the collective bargaining agreement gave the company the right to specify the manner in which equipment was operated, and because Vicki was not disciplined in connection with the incident, it cannot be said that the Union's failure to take any action amounted to acquiescence in retaliation by the company. In short, there is a dearth of evidence that the Union acquiesced in the company's discrimi-

---

6. *Cf. Goodman v. Lukens Steel Co.*, 777 F.2d 113, 126–27 (3rd Cir.1985), *aff'd*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). The *Goodman* court cited *Romero* for the proposition that there is an affirmative duty on the part of unions to combat discrimination in the workplace, but, like *Romero*, found more than "mere acquiescence" in the employer's discriminatory conduct.

Specifically, in *Goodman* the union was liable under Title VII because of its deliberate choice not to process employee grievances, thereby discriminating against the victims who were entitled to representation. Thus, liability was predicated on the union's conduct, not merely on discrimination by the employer.

nation and retaliation against the plaintiff.[7]

Accordingly, summary judgment for the defendants is appropriate on plaintiff's claims under Title VII and the KAAD.

### III. *Conclusion*

The claims remaining for resolution in this case are: (1) Vicki and John's claims against the company for violations of Title VII and the KAAD; and (2) John's fair representation claim against the Union. The court reserves ruling on the applicability of the Civil Rights Act of 1991 to John's Title VII claim, pending further briefing by the parties.

IT IS THEREFORE ORDERED BY THE COURT that [The Company] Defendants' Motion for Summary Judgment (Doc. # 51) is granted as to the plaintiffs' state law claims for the intentional infliction of emotional distress and negligence, but is otherwise denied.

IT IS FURTHER ORDERED that [The Union] Defendants' Motion for Summary Judgment (Doc. # 49) is granted as to plaintiffs' state law claims for the intentional infliction of emotional distress, as to John's claim for emotional distress damages on his fair representation claim, and as to Vicki's Title VII claims, but is otherwise denied.

IT IS FURTHER ORDERED that Defendants' Motion to Dismiss John Anspach's Title VII Claims (Doc. # 83) is denied.

IT IS FURTHER ORDERED that the parties submit to the court additional briefs addressing the applicability of the Civil Rights Act of 1991 to John's Title VII claims, no later than ten (10) days before the first day of trial.

---

7. *Cf. Farmer v. ARA Services Inc.,* 660 F.2d 1096, 1104 (6th Cir.1981), where the court observed that a union's role as a joint participant in the negotiation of a collective bargaining agreement has been found sufficient to render it liable under Title VII where the contractual provisions were discriminatory in operation or perpetuated the effects of past discrimination. The court stated: "It is almost axiomatic that a union's breach of the duty of fair representation also subjects it to liability under Title VII if the breach can be shown to be because of the complainant's race, color, religion, sex, or natural origin." *Id.* This ruling implies that for liability to attach, the union's motivation for acquiescence in an

### MEMORANDUM AND ORDER

This matter is before the court on the motion of plaintiff Vicki Anspach for the court to reconsider several of its rulings rendered by the court on February 11, 1993. In particular, plaintiff contends that the court erred in granting summary judgment for the company defendants on her claims of intentional and negligent infliction of emotional distress.

 The decision of whether to grant or deny a motion for reconsideration is committed to the court's discretion. *See Hancock v. City of Oklahoma City,* 857 F.2d 1394, 1395 (10th Cir.1988). It is well established that a motion for reconsideration is the opportunity for the court to correct manifest errors of law or fact and to review newly discovered evidence or when there has been a change in the law. *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986). Appropriate circumstances for a motion to reconsider are where the court has obviously misapprehended a party's position or the facts or the law, or the court has mistakenly decided issues outside of those the parties presented for determination. *Anderson v. United Auto Workers,* 738 F.Supp. 441, 442 (D.Kan.1990); *Refrigeration Sales Co. v. Mitchell–Jackson, Inc.,* 605 F.Supp. 6, 7 (N.D.Ill.1983). A party's failure to present its strongest case in the first instance does not entitle it to a second chance in the form of a motion to reconsider. *Paramount Pictures Corp. v. Video Broadcasting Sys., Inc.,* No. 89–1412–C, slip op. at 2, 1989 WL 159369 (D.Kan., *unpublished,* Dec. 15, 1989).

employer's discriminatory conduct must be on account of the plaintiff's status as a member of a protected class. While *Romero* does not address the relevance of the union's motivation, the principles enunciated in *Farmer v. ARA Services* appear consistent with *Romero's* holding that summary judgment was inappropriate because of the union's "involvement in the alleged discrimination." *See Romero,* 615 F.2d at 1311. There is no evidence in the instant case that the Union's treatment of the plaintiff was motivated in any way by her sex or by a desire to retaliate against her for opposing sexual harassment.

Having carefully considered the plaintiff's arguments, the court has concluded that its original order was correct, for the reasons stated therein, and therefore plaintiff's motion to reconsider will be denied. For the record, the court will clarify the rationale of the rulings that have been questioned.

Plaintiff urges that the company should be held vicariously liable for the outrageous conduct of her co-workers, citing *Williams v. Community Drive–In Theater*, 214 Kan. 359, 520 P.2d 1296 (1974), and *Hollinger v. Stormont Hosp. & Training School for Nurses*, 2 Kan.App.2d 302, 578 P.2d 1121 (1978). By advancing a theory of "vicarious liability," plaintiff seeks to hold the defendants liable under the doctrine of *respondeat superior*. The question of employer liability for the acts of employees depends upon the relation of the acts to the employer's business:

> "According to the trend of modern authority, the liability of an employer for the acts of his employee depends not upon whether the injurious act of the employee was willful and intentional, but upon whether the employee, when he did the wrong, was acting in the prosecution of the employer's business and within the scope of his authority, or had stepped aside from that business and done an individual wrong. The now generally recognized rule is that an employer is liable for the reckless, willful, intentional, wanton, or malicious acts of his employee as well as for his heedless and careless acts if they are committed while the servant is acting in the execution of his authority and within the course of his employment, or with a view to the furtherance of his employer's business, and not with a purpose personal to the employee...."

*Williams*, 214 Kan. at 366, 520 P.2d at 1302 (quoting 53 Am.Jur.2d, Master and Servant § 438). These principles led the Court of Appeals in *Hollinger* to find that the Hospital was not vicariously liable for the acts of its employee:

> If an assault by an employee is motivated entirely by personal reasons such as malice or spite or by a desire to accomplish some unlawful purpose, and does not have for its purpose the furtherance of the employer's business, it will be considered personal to the employee and not such as will make the employer answerable.

*Hollinger*, 2 Kan.App.2d at 312, 578 P.2d at 1130.

■ Application of these principles to the uncontroverted facts in this case leads to but one conclusion: the employees who harassed Vicki, at the time clock or otherwise, were not acting in furtherance of the company's business or within the scope of their employment. In harassing the plaintiff, the employees stepped aside from the company's business to inflict upon the plaintiff their personal malice and spite. Accordingly, the court finds as a matter of law that the defendants are not liable under a theory of *respondeat superior*.

■ Plaintiff also urges that the court erred in granting summary judgment on her negligence claims. Plaintiff bases her claims on several theories of negligence: (1) negligent retention and supervision; (2) failure to prevent a dangerous situation, and (3) negligent infliction of emotional distress. The Tenth Circuit Court of Appeals observed in *Polson v. Davis*, 895 F.2d 705, 710 (10th Cir.1990), that the Kansas courts had not recognized a cause of action for negligent supervision. At the time *Polson* was written, that was an accurate statement. In 1991, the Kansas Supreme Court decided the case of *Kansas State Bank & Trust Company v. Specialized Transportation Services*, 249 Kan. 348, 819 P.2d 587 (1991). In addressing the foreseeability issue, the court began its analysis by stating: "When a third party asserts a negligent retention and supervision claim against an employer...." *Kansas State Bank*, 249 Kan. at 362, 819 P.2d at 598. This is the first reference in any Kansas appellate opinion to suggest that a cause of action for negligent supervision might exist in Kansas. Prior opinions, including those cited in *Kansas State Bank* on the issue of employer liability, did not involve claims of negligent supervision, but addressed claims of negligent hiring and retention. *See Plains Resources, Inc. v. Gable*, 235 Kan. 580, 682 P.2d 653 (1984); *Hollinger*, 2 Kan.App.2d 302, 578 P.2d 1121. The Kansas Supreme Court did not provide any analysis

or authority to support its apparent recognition of this cause of action, nor did the court provide any indication as to what might be the elements of such a claim. However, the court's recognition of the cause of action is implicit in the language of the *Kansas State Bank* opinion, and therefore serious doubt has been cast on the continued validity of *Polson*'s statement that a cause of action for negligent supervision does not exist in Kansas.

The instant motion for summary judgment can be adjudicated without resolving the apparent conflict between *Polson* and *Kansas State Bank*. On the issue of negligent retention and supervision, *Kansas State Bank* and the other cases cited by plaintiff all concern situations where the alleged victim of the employee's tortious activity is a member of the public, not another employee of the defendant. It has long been the law in Kansas that an employer is not liable for injuries inflicted by one employee upon another employee when the act causing the injury was not done to promote the employer's business and was no part of the employee's duties. *Balin v. Lysle Rishel Post. No. 68,* 177 Kan. 520, syl. ¶ 5, 280 P.2d 623 (1955), *quoted in Hollinger,* 2 Kan.App.2d at 307, 578 P.2d at 1127; *Gabbard v. Sharp,* 167 Kan. 354, 205 P.2d 960 (1949); *Zamora v. Wilson & Co.,* 129 Kan. 285, 282 P. 719 (1929); *Burgert v. Union Pac. R.R. Co.,* 240 F.2d 207, 211–12 (8th Cir.1957) (following Kansas law). As the court has previously discussed, the uncontroverted facts do not permit a reasonable inference that the harassment inflicted on plaintiff by her co-workers was within the scope of their employment. Accordingly, summary judgment is appropriate on plaintiff's negligence claims, whether the claims are based on negligent retention, negligent supervision, or negligent failure to prevent a dangerous situation.

■ Plaintiff's final argument on reconsideration pertains to summary judgment for the defendants on plaintiff's claim of negligent infliction of emotional distress. Plaintiff argues that she has shown sufficient physical injury to recover on her claim of negligent infliction of emotional distress. Plaintiff states that she sought treatment for stress,

troubled sleep, headaches, difficulty concentrating, and crying spells. These allegations, even if true, do not satisfy the requirement of physical injury. "There may be no recovery in Kansas for emotional distress unless that distress results in "physical impact": an actual physical injury to the plaintiff. Generalized physical symptoms of emotional distress such as headaches and insomnia are insufficient to state a cause of action." *Anderson v. Scheffler,* 242 Kan. 857, 860, 752 P.2d 667, 669 (1988) (citations omitted).

The court concludes that its original order was correct, for the reasons stated in that opinion and for those stated herein. Accordingly, plaintiff's motion for reconsideration is denied.

IT IS THEREFORE ORDERED BY THE COURT that Plaintiff's Motion for Reconsideration (Doc. # 90) is denied.